## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 13 2017, 9:54 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kevin Wild
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Michael Gene Worden
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Francisco Garcia, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | March 13, 2017 <br><br> Court of Appeals Case No. <br> 49A02-1608-CR-1728 <br><br> Appeal from the <br> Marion Superior Court <br><br> The Honorable <br> Lisa F. Borges, Judge <br><br> Trial Court Cause No. <br> 49G04-1508-F5-29368 |

**Kirsch, Judge.**

[1] Following a bench trial, Francisco Garcia ("Garcia") was convicted of Level 5 felony criminal confinement,[1] Level 6 felony strangulation,[2] and Level 6 felony domestic battery.[3] He appeals, asserting that the evidence was not sufficient to convict him.

[2] We affirm.

## Facts and Procedural History

[3] In the summer of 2015, Garcia was living in a house with his friend or cousin, Samuel Gutierrez ("Gutierrez"), Gutierrez's wife, Cecilia Medina ("Medina"), and their three children. Garcia lived in the basement of the home. In July 2015, Garcia's girlfriend, L.H., and her five-year-old son moved from Florida to live with Garcia. L.H. and Garcia shared a bed in the basement and lived together as boyfriend and girlfriend. *Tr.* at 11-12.[4]

[4] August 13, 2015, was L.H.'s birthday. Garcia asked L.H. to go with him to his construction job that day, and she went. When they returned to the house that evening, they ate dinner and then went down to the basement. At that time, L.H.'s son was asleep in his bed, which was in the basement. L.H. sensed that Garcia seemed upset, and she asked him what was wrong. He did not give her

---

[1] *See* Ind. Code § 35-42-3-3(a).

[2] *See* Ind. Code § 35-42-2-9(b).

[3] *See* Ind. Code § 35-42-2-1.3(a).

[4] All citations in this decision to *Tr.* refer to Volume II of the Transcript.

an explanation, and an argument ensued. At some point, L.H. told Garcia that she wanted to return to Florida, and she had told him the same thing some days prior. She started to walk out of the room where their bed was located, and Garcia told her, "You're going nowhere" and slapped her on her face, which caused her pain. *Id.* at 14. Garcia then grabbed L.H. by her legs, and she fell backward to the floor onto her back. After she fell, Garcia let go of L.H., and she stood up and walked upstairs. Garcia followed her, calling her names. Gutierrez and Medina were in their bedroom on the first floor in the house, but L.H. did not see or talk to them.

[5] After a few minutes, Garcia and L.H. returned to the basement. L.H. told Garcia that she loved him, but the two continued to argue. *Id.* at 43. L.H. planned to get on a bus and leave "for good" the next day. *Id.* at 44. L.H. walked to the laundry room area of the basement, and Garcia followed her and came toward her holding a switchblade knife. There was no way for L.H. to walk out because it was "a small space," and Garcia was positioned between L.H. and the only way out of laundry room. *Id.* at 20. Garcia came closer, and they "were fighting for the switchblade" when L.H.'s finger got cut. *Id.* They struggled and fell to the floor, and Garcia got on top of L.H. and attempted to place his knee over her hands, which were over her chest, to prevent her from using her hands and arms. Garcia's knee slid and hit L.H. in the face and injured her nose, causing her pain and bleeding. Garcia also grabbed L.H.'s neck with both of his hands. She was telling him to let her go, and it became

hard for her to breathe and speak. When Garcia let her go, she "saw . . . kind of like little stars." *Id.* at 26.

[6] Garcia released L.H., and she ran upstairs, where Medina used L.H.'s phone to call the police. Garcia and Gutierrez had stepped outside the house to talk, and Gutierrez asked Garcia what the screaming and arguing was about. Garcia told him that it was "just argument between a husband and wife." *Id.* at 60. Garcia soon left the premises. The police arrived and spoke with L.H. and Medina, and medical personnel treated L.H. and transported her to a hospital.

[7] On August 28, 2015, the State charged Garcia with six counts: Count 1, Level 5 felony battery by means of a deadly weapon; Count 2, Level 5 felony criminal confinement with bodily injury; Count 3, Level 6 felony strangulation; Count 4, Level 6 felony intimidation; Count 5, Level 6 felony domestic battery committed in the presence of a child; and Count 6, Class A misdemeanor battery resulting in bodily injury. *Appellant's App. Vol. II* at 27-29.

[8] At trial, L.H. testified that she loved Garcia and came from Florida to live with him. Problems developed in the relationship, and by the middle of August, she began talking of plans to return to Florida with her son. L.H. described the physical altercation that took place beginning on the evening of August 13 and into the early morning hours of August 14 and stated that her son was in the basement in his bed during this time. She describing how Garcia slapped her, came at her with a switchblade, held her to the ground, and placed his hands around her neck. L.H. said that when Garcia let go of her neck, she was "a

little dizzy," felt unsteady, and her head hurt. *Tr*. at 26. L.H. testified that a day or so after the incident, Garcia called her and told her that "this was not over." *Id*. at 33. She believed that he was threatening her life.

[9] Medina testified that in the summer of 2015, Garcia was living at her home and that Garcia's girlfriend, L.H., came to stay with him. Medina testified that on the night in question she was awakened to the voices of both Garcia and L.H., arguing in the basement. Medina heard them come from the basement to the main floor, where her bedroom was, and she looked out of her bedroom and saw them arguing in the dining room. After "a matter of minutes[,]" she saw them return to the basement. *Id*. at 65. When L.H. later came back up, Medina saw that L.H.'s hand or finger was cut and that she was bleeding, and Medina saw blood on her nose. Medina assisted L.H. with calling the police.

[10] Indianapolis Metropolitan Police Department ("IMPD") Officer Damon Young testified that he was dispatched around 2:00 a.m. on August 14 to what was later identified as Gutierrez and Medina's home. Upon arrival, he encountered two females standing in the alley by the house, and one was bleeding from her face.

[11] That concluded the State's evidence and witnesses, and Garcia moved for involuntary dismissal under Indiana Trial Rule 41(B) of the following charges: Count 1, battery by means of a deadly weapon; Count 4, intimidation; and Count 5, domestic battery. The trial court granted Garcia's motion as to Count 4, intimidation, but denied Garcia's motion as to the other charges.

[12]     Garcia then called as a witness an investigator with the Domestic Violence Unit, IMPD Detective Michael Kermon ("Detective Kermon"), who went to the home on August 18 and interviewed L.H. and Medina. L.H. told Detective Kermon in that interview that Garcia slapped her, grabbed her by the hair, and threw her to the floor. She described to Detective Kermon that Garcia's knee hit her in the stomach, and after that, she fell to the floor. L.H. said that she wrestled the knife away from Garcia. It was noted that this description was not the same as L.H.'s testimony at trial, and on cross-examination, Detective Kermon testified that people sometimes recall different details at different times due to the traumatic nature of an event or experience, and that it is not unusual for people to relate details out of order or in the wrong order in the few days after the event.

[13]     Garcia testified in his defense and described the incidents that occurred on the date in question, noting, "I love her, how was I going to hurt her." *Id*. at 93. He said that she went with him to work, and after they returned at around 6:00 or 7:00 p.m., they ate dinner with Gutierrez and Medina. Garcia said that Gutierrez and L.H. "drank some beers." *Id*. at 94. Garcia testified that he and L.H. went to the basement around 9:00 or 10:00 p.m. to go to bed, but they began arguing about L.H.'s plan to return to Florida. Garcia said their demeanors were "calm," but that L.H. began to hit and slap him in the face, and he grabbed her wrists to keep her from hitting him. *Id*. at 95-96. Garcia testified that he never hit L.H., and he denied that he ever had a knife. Garcia described that at some point they both fell to the floor, and, as she fell, L.H. hit

some sharp tools that Gutierrez used for drywall work, causing her to bleed. Garcia said that they immediately got up, he checked her cut, and then they went upstairs. He said that he tried to clean the cut, but L.H. was upset, so Garcia told Medina to bandage it while Garcia went outside with Gutierrez. Garcia testified that he did not hear the police being called. "[I]n order not to have problems," and at Gutierrez's suggestion, Garcia left and went to Gutierrez's brother's house. *Id*. at 99.

[14] The trial court found Garcia not guilty as to Count 1, Level 5 felony battery by means of a deadly weapon, but guilty of the following: Count 2, Level 5 felony criminal confinement with bodily injury; Count 3, Level 6 felony strangulation; Count 5, Level 6 felony domestic battery committed in the presence of a child; and Count 6, Class A misdemeanor battery resulting in bodily injury. During the sentencing hearing, the trial court vacated Count 6 due to double jeopardy concerns, and it sentenced Garcia to three years on Count 2 and to 365 days each for Counts 3 and 5. The three sentences were ordered to be served concurrently, for an aggregate three-year sentence. Garcia now appeals.

## Discussion and Decision

[15] Garcia claims that the State failed to present sufficient evidence to convict him of domestic battery, strangulation, and criminal confinement. When reviewing the sufficiency of the evidence to support a conviction, we must consider only the probative evidence and reasonable inferences supporting the verdict. *Palacios v. State*, 926 N.E.2d 1026, 1034 (Ind. Ct. App. 2010). We do not assess witness credibility or reweigh the evidence. *Id.* We consider conflicting

evidence most favorably to the conviction. *Id.* We affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. *Id.* It is not necessary that the evidence overcome every reasonable hypothesis of innocence. *Id.* A conviction may be sustained on the uncorroborated testimony of a single witness. *Johnson v. State*, 804 N.E.2d 255, 256 (Ind. Ct. App. 2004). The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict. *Palacios*, 926 N.E.2d at 1034.

### *Domestic Battery*

[16] To convict Garcia of domestic battery, the State was required to prove that he "knowingly or intentionally touch[ed] an individual who . . . is or was living as if a spouse of the other person . . . in a rude, insolent, or angry manner that results in bodily injury to the person." Ind. Code § 35-42-2-1.3(a)(2). The offense is a Class A misdemeanor; however, it is a Level 6 felony if the battery is committed in the physical presence of a child less than 16 years of age. Ind. Code § 35-42-2-1.3(b)(2). Garcia's sole claim on appeal is that the State failed to prove the "living as if a spouse" element, asserting that he and L.H. lived together for only about a month and noting that there was no evidence of such things as paying bills or sharing income.

[17] Indiana Code section 35-42-2-1.3(c) set forth factors to consider in determining whether a person is or was living as a spouse of another for purposes of subsection (a)(2):

(1) the duration of the relationship;

(2) the frequency of contact;

(3) the financial interdependence;

(4) whether the two (2) individuals are raising children together;

(5) whether the two (2) individuals have engaged in tasks directed toward maintaining a common household; and

(6) other factors the court considers relevant.

We have explained, however, "[T]hese factors are not intended as a litmus test and do not need to be consulted if the character of the relationship is clearly 'domestic.'" *Bowling v. State*, 995 N.E.2d 715, 717 n.4 (Ind. Ct. App. 2013) (quoting *Williams v. State*, 798 N.E.2d 457, 461 (Ind. Ct. App. 2003)); *Croy v. State*, 953 N.E.2d. 660, 663 (Ind. Ct. App. 2011). "[T]he domestic battery statute envisions a situation, among others, where individuals are (or were) involved in an ongoing relationship and cohabitating." *Bowling*, 995 N.E.2d at 717.

[18] Here, L.H. testified that Garcia was her boyfriend, and that she moved herself and her son from Florida to live with Garcia. *Tr.* at 11. L.H. testified that she loved Garcia, and Garcia testified that he loved L.H. The two were cohabitating and were in an ongoing romantic relationship, sharing a bed in the basement. Gutierrez testified that, when he asked Garcia what the fighting was

about, Garcia told him that it was "just argument between a husband and wife." *Id.* at 60. This testimony indicates that Garcia considered the relationship to be living as if spouses. We affirm a conviction unless no reasonable fact-finder could have found the elements of the crime proven beyond a reasonable doubt. *Steele v. State*, 42 N.E.3d 138, 144 (Ind. Ct. App. 2015). We conclude that the State presented evidence of probative value from which a reasonable trier of fact could have found Garcia guilty of domestic battery.

### *Strangulation*

[19] To convict Garcia of strangulation, the State was required to prove beyond a reasonable doubt that Garcia, in a rude, angry, or insolent manner, knowingly or intentionally applied pressure to the nose or throat of L.H. or obstructed the nose or mouth of L.H., in a manner that impeded the normal breathing or blood circulation of L.H. Ind. Code § 35-42-2-9(b).

[20] L.H. testified that Garcia, while angry, grabbed her neck with both of his hands, that as a result she had difficulty breathing and speaking, she was seeing "little stars," and was dizzy and unsteady after he released her. *Tr.* at 26. This is sufficient evidence to sustain the strangulation conviction.

[21] Garcia asserts that the symptoms to which L.H. testified to experiencing when Garcia had his hands around her throat are "better explained" by the rest of the incident, "in particular an accidental knee to the face" and Garcia's "full weight on top of her." *Appellant's Br.* at 12. His argument is that it is speculation to say

that one and not the other of these explanations caused the symptoms. This is a request for us to reweigh the evidence, which we cannot do. *Palacios*, 926 N.E.2d at 1034. The evidence was sufficient to convict Garcia of strangulation as charged.

### *Criminal Confinement*

[22] Garcia asserts that the State failed to present sufficient evidence to convict him of criminal confinement. Indiana Code section 35-42-3-3 provides that a person commits criminal confinement if he knowingly or intentionally confines another person without the other person's consent, and it is a Level 5 felony if it results in bodily injury to the other person. Ind. Code § 35-42-3-3(a), (b).

[23] L.H. testified that, after they ate dinner and went downstairs, she told Garcia that she was going back to Florida, and he told her, "[Y]ou're going nowhere," slapped her in the face and, grabbing her feet, knocked her to the ground. *Tr.* at 14. Later, after the two of them had been upstairs briefly but returned to the basement, Garcia followed her into the small laundry room area and came toward her while holding a switchblade, which cut her finger. Thereafter, he held her to the ground, holding her wrists. She struggled to get free, and his knee hit her nose, causing her pain and bleeding. The injury to her nose left a scar. *Id.* at 25.

[24] Garcia's argument challenging the criminal confinement conviction asserts that L.H.'s trial testimony describing the events that occurred that night was not consistent with what she had told Detective Kermon and that her testimony

was self-serving and minimized her involvement, such as by indicating that her demeanor was calm at times, although Medina testified that she heard both Garcia and L.H. arguing in angry voices that night. Garcia contends that, therefore, L.H.'s credibility is "seriously lacking[,]" which "introduces reasonable doubt into the case." *Appellant's Br*. at 18, 20. We do not judge witness credibility on appeal. *Richard v. State*, 816 N.E.2d 72, 74 (Ind. Ct. App. 2004). The evidence was sufficient to support a finding that Garcia confined L.H. without her consent and that she suffered injury.

Affirmed.

Robb, J., and Barnes, J., concur.