

FILED

Jun 28 2023, 8:53 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Nathaniel C. Henson
Devon DeMarco
Rhame, Elwood & McClure, PC
Portage, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Evan Matthew Comer
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Jason Gibbs,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff.*

June 28, 2023

Court of Appeals Case No.
22A-CR-1041

Appeal from the Porter Superior
Court

The Honorable Michael A. Fish,
Judge

Trial Court Cause No.
64D01-1604-F6-3024

**Opinion by Judge Pyle**

Chief Judge Altice and Judge Riley concur.

**Pyle, Judge.**

## Statement of the Case

Jason Gibbs ("Gibbs") appeals his convictions, following a jury trial, for two counts of Class A felony child molesting,[1] two counts of Class B felony incest,[2] one count of Level 4 felony incest,[3] two counts of Class C felony sexual misconduct with a minor,[4] and two counts of Level 5 felony sexual misconduct with a minor.[5] Gibbs also appeals the aggregate sentence imposed for his nine felony convictions. Gibbs argues that the trial court abused its discretion when it denied his motion for a mistrial and that his aggregate sentence is inappropriate. Concluding that the trial court did not abuse its discretion when it denied Gibbs' motion for a mistrial and that his aggregate sentence is not inappropriate, we affirm Gibbs' convictions and sentence.

We affirm.

## Issues

1.  Whether the trial court abused its discretion when it denied Gibbs' motion for a mistrial.

2.  Whether Gibbs' sentence is inappropriate.

---

[1] IND. CODE § 35-42-4-3(a)(1) (2007).

[2] I.C. § 35-46-1-3(a) (1994).

[3] I.C. § 35-46-1-3(a) (2014).

[4] I.C. § 35-42-4-9(b)(1) (2007).

[5] I.C. § 35-42-4-(b)(1)(2014).

## Facts

The facts most favorable to the judgment reveal that Gibbs and Michelle Howisen ("Mother") are the parents of: (1) Victoria ("Victoria"), who was born in April 1995, when Mother was fifteen years old; (2) Jason, Jr., who was born in April 1996; (3) Steven, who was born in October 1997; (4) K.G. ("K.G."), who was born in October 1998 and is one of two victims in this case; (5) N.G. ("N.G."), who was born in November 1999 and is the second victim in this case; and (6) Stephanie, who was born in June 2002. Gibbs and Mother have been married twice and divorced twice. Gibbs also has four or five additional children with two other women. One or more of those children were born while Gibbs was married to Mother. The three youngest of those children were born in 2005, 2010, and 2012 and have the same mother.

In late October or early November 2011, Gibbs, Mother, and their six children moved to a house in Wheeler, Indiana ("the Wheeler house"). K.G. was thirteen years old, and N.G. was twelve years old. Shortly after moving into the Wheeler house, Gibbs took K.G. shopping for bras and underwear. While K.G. tried on bras in the dressing room, Gibbs placed his hands on K.G.'s breasts, explaining that he was determining what bra cup size she needed. Gibbs also told K.G. to try on thong underwear so that he could see how the underwear looked on her.

Also, while the family lived in the Wheeler house, Gibbs went into K.G.'s bedroom in the middle of the night, woke her up, and took her into his

bedroom.[6] Gibbs placed K.G. on his bed, rubbed her thighs and her vagina, and told her that Mother no longer "showed [him] any love or affection." (Tr. Vol. 3 at 33). Thereafter, Gibbs placed his finger between the lips of K.G.'s vagina and "jerk[ed] off" with his other hand until he ejaculated. (Tr. Vol. 3 at 34). Gibbs referred to the act of placing his finger between K.G.'s vagina lips while he masturbated as the "easy way" ("the easy way"). (Tr. Vol. 3 at 38). Other incidents of the easy way occurred for three years.

[4] When K.G. turned fourteen years old and the family still lived at the Wheeler house, Gibbs began placing his penis between the lips of her vagina while he "hump[ed] forward and back." (Tr. Vol. 3 at 39). Gibbs referred to this act as the "hard way" ("the hard way"). (Tr. Vol. 3 at 41). Other incidents of the hard way occurred for two years. After Gibbs had inappropriately touched K.G., either the easy way or the hard way, Gibbs often rewarded K.G. with body piercings, tattoos, hair dyes, electronics, and shopping trips.

[5] In addition, on another occasion, while the family lived at the Wheeler house, Gibbs went into the bathroom while K.G. was showering and told her that he wanted her to shave her pubic hair because "he like[d] it bald." (Tr. Vol. 3 at 36). After K.G. had shaved her pubic hair, Gibbs "rub[bed] against [K.G.'s] vagina lips with his fingers," "jerked off[,]" and ejaculated onto the bathroom floor. (Tr. Vol. 3 at 37).

---

[6] Mother regularly slept on the living room couch.

[6]     Gibbs also began sexually abusing N.G. while the family lived in the Wheeler house. On one occasion, while N.G. was taking a shower, Gibbs walked into the bathroom, "whipped the [shower] curtain open[,]" and stared at N.G. (Tr. Vol. 3 at 206). N.G. got out of the shower and got dressed. As N.G. started to walk out of the bathroom, Gibbs took her into his bedroom, sat on the bed with her, told her that she needed to shave her pubic area, and told her to pull down her pants. When N.G. refused to pull down her pants, Gibbs pulled them down to her knees, "spread the lips of [her] vagina open," "show[ed] her the middle part[,]" "told her that [was] [her] clit[,]" and began "touching it." (Tr. Vol. 3 at 208-09). When N.G. began crying, Gibbs pushed her down on her bed, "stuck his index finger inside of [her,]" and asked her if she liked what he was doing. (Tr. Vol. 3 at 210). N.G. responded that it hurt and that it "fe[lt] like [she] ha[d] to pee[.]" (Tr. Vol. 3 at 211.) Gibbs also told N.G. that she had "big boobs" for her age and "lift[ed] them up[.]" (Tr. Vol. 3 at 211).

[7]     On another occasion, shortly before St. Patrick's Day, N.G. asked Gibbs to purchase her a green shirt to wear to school. On the way to purchase the shirt, Gibbs stuck his hand down N.G.'s pants and attempted to insert his finger in her vagina. When N.G. squeezed her thighs together, Gibbs asked her "what the fuck [was] wrong with [her]" and told her that she was not getting "a fucking shirt[.]" (Tr. Vol. 3 at 213).

[8]     One night, while Mother was sleeping in an upstairs bedroom, and N.G. was sleeping on the living room couch, Gibbs got on the couch with N.G. and "spooned" her. (Tr. Vol. 3 at 2016). N.G. felt Gibbs' hard penis touching her

buttocks. Gibbs attempted to stick his hand in N.G.'s pants but left the living room when N.G. told him that she heard Mother coming down the stairs. On another occasion, Gibbs went into N.G.'s bedroom while she was sleeping, squeezed her breasts, stuck his hand under her underpants, and rubbed her vagina with two of his fingers.

[9] In addition, one Wednesday evening, while N.G. was cleaning Gibbs' bedroom before going to church, Gibbs told her that she was "not going to fucking church" that night. (Tr. Vol. 3 at 222). Gibbs placed N.G. on the bed and removed her pants and underwear. When N.G. told Gibbs to stop because she did not want to do that, Gibbs slapped N.G., leaving his fingerprints on her face. Gibbs then inserted his middle finger in N.G.'s vagina and moved his finger around. When N.G. told Gibbs to stop, Gibbs told N.G. to "stop with [her] bitch-ass attitude[.]" (Tr. Vol. 3 at 223). N.G. asked Gibbs why he was doing that to her, and Gibbs responded that her "mom wasn't giving [him] any." (Tr. Vol. 3 at 225). When N.G. told Gibbs that she was going to tell Mother what he had been doing to her, Gibbs responded, "your mom's a bitch." (Tr. Vol. 3 at 224). Gibbs further told N.G. that Mother did not have money to support the family and that if N.G. wanted to be hungry, then that was on her. Gibbs sexually abused N.G. every few months for three years.

[10] At some point in 2013, Gibbs and Mother separated, and Gibbs moved to a house in Portage ("the Portage house"). Gibbs continued to sexually abuse K.G. when she visited him at the Portage house. One morning in 2014, after Gibbs had just finished doing it the hard way, Gibbs was sitting at the kitchen

table in his bathrobe, and K.G. was standing naked between the kitchen and the living room. As Gibbs and K.G. were talking, K.G. heard someone entering the house. K.G. ran to the bedroom as her aunt ("aunt") and uncle ("uncle") walked in the back door. When K.G. returned to the kitchen, she had a sheet draped around her. K.G. told aunt and uncle that Gibbs had hurt her and that she wanted to go home.

[11] In November 2014, K.G. told Mother that Gibbs had been sexually abusing her for the previous three years. During their conversation, Gibbs arrived at Mother's home with the electronic device that he had promised K.G. as a reward for doing it the easy way at the Portage house. Gibbs, Mother, and K.G. went to Gibbs' car to talk privately. Gibbs asked K.G. if she had told Mother what had been happening. K.G. responded that she had, and Gibbs apologized to Mother and told her that he had "made a mistake, [he had] touched the girls[.]" (Tr. Vol. 3 at 89).

[12] The State initially charged Gibbs with three felony counts in March 2016. Following several delays in the case, the State charged Gibbs with ten felony counts in a January 2022 second amended information. Specifically, the State charged Gibbs with: (1) Class A felony child molesting for knowingly or intentionally penetrating K.G.'s sex organ with his finger between November 8, 2011 and October 26, 2012, when K.G. was under fourteen years old and Gibbs was at least twenty-one years old; (2) Class A felony child molesting for knowingly or intentionally penetrating N.G.'s sex organ with his finger between November 8, 2011 and November 7, 2013, when N.G. was under fourteen

years old and Gibbs was at least twenty-one years old; (3) Class B felony incest for knowingly or intentionally engaging in deviate sexual conduct with K.G. between November 8, 2011 and June 30, 2014, when Gibbs knew that K.G. was related to him biologically as a child and was less than sixteen years old, and Gibbs was eighteen years of age or older; (4) Class B felony incest for knowingly or intentionally engaging in deviate sexual conduct with N.G. between November 8, 2011 and June 30, 2014, when Gibbs knew that N.G. was related to him biologically as a child and was less than sixteen years old, and Gibbs was eighteen years of age or older; (5) Level 4 felony incest for knowingly or intentionally engaging in deviate sexual conduct with K.G. between July 1, 2014 and October 23, 2014, when he knew that K.G. was related to him biologically as a child and was less than sixteen years old, and Gibbs was eighteen years of age or older; (6) Level 4 felony incest for knowingly or intentionally engaging in deviate sexual conduct with N.G. between July 1, 2014 and October 23, 2014, when he knew that N.G. was related to him biologically as a child and was less than sixteen years old, and Gibbs was eighteen years of age or older; (7) Class C felony sexual misconduct with a minor for knowingly or intentionally performing or submitting to any fondling or touching of either K.G. or himself with the intent to arouse or satisfy the sexual desires of either K.G. or himself between October 27, 2012 and June 30, 2014, when K.G. at least fourteen years old but less than sixteen years old and Gibbs was at least twenty-one years old; (8) Class C felony sexual misconduct with a minor for knowingly or intentionally performing or submitting to any fondling or touching of either N.G. or himself with the intent

to arouse or satisfy the sexual desires of either N.G. or himself between November 8, 2012 and June 30, 2014, when N.G. was at least fourteen years old but less than sixteen years old and Gibbs was at least twenty-one years old; (9) Level 5 felony sexual misconduct with a minor for knowingly or intentionally performing or submitting to any fondling or touching of either K.G. or himself with the intent to arouse or satisfy the sexual desires of either K.G. or himself between July 1, 2014 and October 23, 2014, when K.G. was at least fourteen years old but less than sixteen years old and Gibbs was at least twenty-one years old; and (10) Level 5 felony sexual misconduct with a minor for knowingly or intentionally performing or submitting to any fondling or touching of either N.G. or himself with the intent to arouse or satisfy the sexual desires of either N.G. or himself between July 1, 2014 and October 23, 2014 when N.G. was at least fourteen years old but less than sixteen years old, and Gibbs was at least twenty-one years old.

[13] At Gibbs' March 2022 five-day trial, the trial court instructed the jury as follows:

### PRELIMINARY INSTRUCTION #11

*   *   *

Occasionally, the Court may strike evidence from the record after you have already seen or heard it. You must not consider such evidence in making your decision.

Your verdict should be based only on the evidence admitted and the instructions on the law. Nothing that I say or do is intended to recommend what facts or what verdict you should find.

(App. Vol. 3 at 23).

[14] Also, at trial, the jury heard the facts as set forth above during the testimony of then twenty-three-year-old K.G. and then twenty-two-year-old N.G. In addition, Mother testified that Gibbs had always instructed her to shave her pubic area because "he like[d] no hair." (Tr. Vol. 3 at 88). Aunt testified that shortly before trial, Gibbs had telephoned uncle. During the telephone conversation, aunt had heard Gibbs tell uncle that aunt and uncle had "better get the story straight." (Tr. Vol. 3 at 148). Gibbs further told uncle that he would "make trouble" for aunt and uncle if they did not tell the truth at trial. (Tr. Vol. 3 at 148).

[15] Victoria also testified at Gibbs' trial. During direct examination, the State asked Victoria about her relationship with Gibbs. Victoria testified that she and Gibbs had initially had a good relationship but that the relationship had changed. When the State asked Victoria why the relationship with Gibbs had changed, Victoria responded because "[h]e inappropriately touched me." (Tr. Vol. 3 at 109). Gibbs made an oral motion to strike Victoria's testimony, which the trial court granted. The trial court also admonished the jury "to disregard the statement made . . . by the witness" and took a brief recess. (Tr. Vol. 3 at 109). During the recess, Gibbs orally moved for a mistrial. After reviewing case law, the trial court denied Gibbs' motion. Thereafter, additional witnesses testified that afternoon. The following morning, Gibbs renewed his motion for a mistrial and alternatively asked the trial court to allow him to cross-examine Victoria regarding the veracity of her statement. The trial court denied Gibbs'

motion for a mistrial and told him that he could recall Victoria as a witness during his case-in-chief.

[16] During closing argument, the State reviewed the elements of each of the ten charges against Gibbs. The State then pointed to specific testimony from K.G. and N.G. and argued that the young women's testimony provided evidence for each element of the ten charges. During Gibbs' closing argument, Gibbs' counsel told the jury that he generally put the elements of the charged offenses up on a screen and attempted to "knock them out." (Tr. Vol. 4 at 167). Gibbs' counsel further explained that he was not going to do that in this case because Gibbs' position was "that these allegations [had been] fabricated." (Tr. Vol. 4 at 167). Specifically, according to Gibbs' counsel, K.G. and N.G. had fabricated the allegations against Gibbs because they had been angry at him for fathering children with other women while he was married to Mother.

[17] The jury convicted Gibbs of both counts of Class A felony child molesting, both counts of Class B felony incest, one count of Level 4 felony incest, both counts of Class C felony sexual misconduct with a minor, and both counts of Level 5 felony sexual misconduct with a minor. The jury was unable to reach a verdict on the remaining Level 4 felony incest charge, and the State dismissed that charge.

[18] At Gibbs' March 2022 sentencing hearing, the trial court reviewed Gibbs' pre-sentence investigation report, which revealed that Gibbs had two prior felony convictions for the fraudulent purchase of firearms as well as prior gang

membership.  Also, at the sentencing hearing, the State argued that Gibbs had been "convicted of distinct acts with each victim and deserve[d] distinct sentences for each of those." (Tr. 4 at 193).  Gibbs, on the other hand, argued that the imposition of multiple sentences would violate the Indiana substantive double jeopardy clause.  According to Gibbs, the "lessers . . . merge[d] into" the Class A felony child molesting convictions.  (Tr. Vol. 4 at 200).  Gibbs further argued that he should be sentenced to the minimum twenty-year sentence for each of the Class A felony convictions and that the two sentences should run concurrently with each other for an aggregate sentence of twenty years.

[19]     After hearing the parties' arguments, the trial court found the following "significant and troubling" aggravating circumstances:  (1) K.G. and N.G. were Gibbs' biological daughters; (2) Gibbs had prior felony convictions and prior gang involvement; (3) the harm, injury, loss, or damage suffered by K.G. and N.G. was significant and greater than the elements necessary to prove the commission of the offenses as demonstrated by the young women's trial testimony; (4) Gibbs had threatened victim N.G. and witnesses aunt and uncle; and (5) Gibbs had harmed K.G. and N.G. multiple times and abused them over a significant period of time.  (Tr. Vol. 4 at 203).  The trial court found as a mitigating factor that Gibbs had three young children who depended on him for support.  In addition, the trial court rejected Gibbs' double jeopardy argument because "the State . . . presented separate incidents proving each of the nine counts on which the jury convicted [Gibbs].  In some of those counts, there were multiple occurrences of the crime.  The acts happened at different times

and in different places. Each count contains distinct characteristics." (Tr. Vol. 4 at 204).

[20] Thereafter, the trial court sentenced Gibbs to forty-five (45) years for each Class A felony conviction, eighteen (18) years for each Class B felony conviction, eleven (11) years for the Level 4 felony conviction, six (6) years for each Class C felony conviction, and three (3) years for each Level 5 felony conviction. The trial court further ordered the sentences to run consecutively to each other, resulting in an aggregate sentence of 155 years.

[21] Gibbs now appeals his convictions and sentence.

## Decision

[22] Gibbs argues that the trial court abused its discretion when it denied his motion for a mistrial and that his sentence is inappropriate. We address each of his contentions in turn.

### 1. Motion for Mistrial

[23] Gibbs first argues that the trial court abused its discretion when it denied his motion for a mistrial. The denial of a motion for a mistrial rests within the sound discretion of the trial court, and we review the trial court's decision only for an abuse of that discretion. *Brittain v. State*, 68 N.E.3d 611, 619 (Ind. Ct. App. 2017), *trans. denied*. Further, the trial court is entitled to great deference on appeal because the trial court is in the best position to evaluate the relevant circumstances of a given event and its probable impact on the jury. *Id*. at 620. To prevail on appeal from the denial of a motion for mistrial, a defendant must

demonstrate that the statement in question was so prejudicial that he was placed in a position of grave peril. *Id.* The gravity of the peril is measured by the challenged conduct's probable persuasive effect on the jury's decision, not the impropriety of the conduct. *Mickens v. State*, 742 N.E.2d 927, 929 (Ind. 2001). Granting a mistrial "is an extreme remedy that is warranted only when no other action can be expected to remedy the situation." *Kemper v. State*, 35 N.E.3d 306, 309 (Ind. Ct. App. 2015), *trans. denied*. Further, a timely and accurate admonishment is presumed to cure any error in the admission of evidence. *Banks v. State*, 761 N.E.2d 403, 405 (Ind. 2002). In addition, "[w]e presume the jury followed the trial court's admonishment and that the excluded testimony played no part in the jury's deliberation." *Francis v. State*, 758 N.E.2d 528, 532 (Ind. 2001). We also presume that the jury followed the trial court's instructions. *Weisheit v. State*, 109 N.E.3d 978, 989 (Ind. 2018), *cert. denied*.

[24] Here, our review of the record reveals that before the jury heard any evidence, the trial court read Preliminary Instruction Number 11, which advised the jury that the trial court might strike evidence from the record after the jury had already heard it. The trial court further instructed the jury that it must not consider such evidence in making its decision. During the trial, the trial court admonished the jury to disregard Victoria's statement immediately after she had made it. Both the trial court's instruction and admonition were clear, and we find nothing in the record to suggest that the jury did not follow the instruction and the admonition. As such, we presume that the jury followed the trial court's admonition and instruction and conclude that the trial court's timely

admonishment sufficiently dispelled any grave peril and justified the denial of
Gibbs' motion for a mistrial.  We further note that Victoria's brief statement in
the five-day trial was never mentioned again, and K.G. and N.G. both gave
detailed testimony about the specific and repeated sexual acts that Gibbs had
perpetrated against them.  *See Szpyrka v. State*, 550 N.E.2d 316, 318 (Ind. 1990)
(concluding that where the victims had positively identified the defendant, "it
stretche[d] credulity to believe that the jury could have been swayed to such an
extent that except for the improper remark by the police officer appellant would
have been acquitted.").  The trial court did not abuse its discretion in denying
Gibbs's motion for a mistrial.[7]

## 2. Inappropriate Sentence

[25]    Gibbs also argues that his aggregate 155-year sentence is inappropriate.  Indiana
Appellate Rule 7(B) provides that we may revise a sentence authorized by
statute if, after due consideration of the trial court's decision, we find that the
sentence is inappropriate in light of the nature of the offense and the character
of the offender.  The defendant bears the burden of persuading this Court that
his sentence is inappropriate.  *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind.
2006).  Whether we regard a sentence as inappropriate turns on the "culpability

---

[7] Gibbs alternatively argues that the trial court should have allowed him "cross[-]examination into the veracity of Victoria['s] . . . statement regarding uncharged conduct."  (Gibbs' Br. 13).  However, Gibbs has waived appellate review of this one-sentence argument that is not supported by citation to authority or portions of the record.  *See Wingate v. State*, 900 N.E.2d 468, 475 (Ind. Ct. App. 2009) (explaining that a party waives an issue where the party fails to develop a cogent argument or provide adequate citation to authority and portions of the record).

of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Cardwell v. State*, 895 N.E.2d 1219, 1224 (Ind. 2008).

[26] When determining whether a sentence is inappropriate, we acknowledge that the advisory sentence is the starting point the Legislature has selected as an appropriate sentence for the crime committed. *Childress*, 848 N.E.2d at 1081. Here, the jury convicted Gibbs of two Class A felonies, two Class B felonies, one Level 4 felony, two Class C felonies, and two Level 5 felonies. The sentencing range for a Class A felony is between twenty (20) and fifty (50) years, and the advisory sentence is thirty (30) years. I.C. § 35-50-2-4(a). The sentencing range for a Class B felony is between six (6) and twenty (20) years, and the advisory sentence is ten (10) years. I.C. § 35-50-2-5(a). The sentencing range for a Level 4 felony is between two (2) and twelve (12) years, and the advisory sentence is six (6) years. IND. CODE § 35-50-2-5.5. The sentencing range for a Class C felony is between two (2) and eight (8) years, and the advisory sentence is four (4) years. I.C. § 35-50-2-6(a). Lastly, the sentencing range for a Level 5 felony is between one (1) and six (6) years, and the advisory sentence is three (3) years. I.C. § 35-50-2-6(b).

[27] The trial court sentenced Gibbs to forty-five (45) years for each Class A felony conviction, eighteen (18) years for each Class B felony conviction, eleven (11) years for the Level 4 felony conviction, six (6) years for each Class C felony conviction, and three (3) years for each Level 5 felony conviction. The trial court further ordered the sentences to run consecutively to each other, resulting

in an aggregate sentence of 155 years. This 155-year aggregate sentence is considerably less than the potential maximum sentence of 180 years.

[28] With regard to the nature of the offenses, we note that Gibbs began regularly sexually abusing his two biological daughters when they were twelve and thirteen years old. The abuse included Gibbs placing his fingers between the lips of K.G.'s vagina while he masturbated and placing his penis between the lips of K.G.'s vagina while he humped back and forth. Gibbs nicknamed these acts as the easy way and the hard way and rewarded K.G. with body piercings, tattoos, hair dyes, electronics, and shopping trips when she complied with his sexual demands. In addition, Gibbs sexually abused N.G., including digitally penetrating her multiple times. When N.G. asked Gibbs to stop the sexual acts against her, he rebuffed her plea by inflicting physical harm upon her, such as by slapping her face. Further, after N.G. had threatened to tell Mother about Gibbs' acts, he manipulated N.G. to believe that she would be the cause of the family going hungry and experiencing financial loss if she were to reveal his actions to Mother. Gibbs perpetrated these heinous acts against his daughters for three years. Moreover, Gibbs blamed his criminal actions on Mother, telling his daughters that he was engaging in sexual acts with them because Mother would no longer have a sexual relationship with him. Our Indiana Supreme Court has explained that "when the perpetrator commits the same offense against two victims, enhanced and consecutive sentences seem necessary to vindicate the fact that there were separate harms and separate acts against more than one person." *Serino v. State*, 798 N.E.2d 852, 857 (Ind.

2003). "Similarly, additional criminal activity directed to the same victim should not be free of consequences." *Cardwell*, 895 N.E.2d at 1225. The supreme court has further explained that "[a] harsher sentence is also more appropriate when the defendant has violated a position of trust that arises from a particularly close relationship between the defendant and the victim, such as a parent-child . . . relationship." *Hamilton v. State*, 955 N.E.2d 723, 727 (Ind. 2011).

[29] With regard to Gibbs' character, we note that the evidence presented at trial about Gibbs' multiple sexual offenses against his daughters over multiple years reveals the disturbing and manipulative aspects of Gibbs' character. Moreover, Gibbs threatened aunt and uncle, who had discovered K.G. draped in a sheet at the Portage house and whom K.G. had told that Gibbs had hurt her, to get their story straight before testifying at trial. In addition, we note that Gibbs' prior felony convictions and gang membership speak poorly to his character. *See Quintanilla v. State*, 146 N.E.3d 982, 989 (Ind. Ct. App. 2020) (explaining that even a minor criminal history speaks poorly to a defendant's character).

[30] Based on the nature of the offenses and his character, Gibbs has failed to persuade this Court that his aggregate 155-year sentence for his nine felony

convictions for sexual offenses perpetrated against his biological daughters over a period of three years is inappropriate.[8]

[31] Affirmed.

Altice, C.J., and Riley, J., concur.

---

[8] Gibbs also argues that his convictions violate Indiana's prohibition against double jeopardy. He specifically contends that his Class B and Level 4 felony convictions for incest and his Class C and Level 5 felony convictions for sexual misconduct with a minor are all lesser included offenses of his Class A felony child molesting convictions. The State responds that "the trial court did not run afoul of Indiana's substantive double jeopardy principles" because Gibbs was "properly convicted of more than one crime[.]" (State's Br. 41). The State specifically contends that "the facts from trial showed that [Gibbs']actions constituted multiple criminal transactions for which he could be held separately liable." (State's Br. 41). The State is correct.

In *Wadle v. State*, 151 N.E.3d 227, 247 (Ind. 2020), our Indiana Supreme Court recognized that "[s]ubstantive double jeopardy claims come in two principal varieties: (1) when *a single criminal act or transaction* violates a single statute but harms multiple victims, and (2) when *a single criminal act or transaction* violates multiple statutes with common elements and harms one or more victims." (emphasis added). Here, however, Gibbs was convicted of *multiple criminal acts or transactions* that occurred over a three-year period of time. There is no violation of substantive double jeopardy because the facts show separate and distinct crimes. *See id.* at 249 (explaining that if the facts show separate and distinct crimes, there is no violation of substantive double jeopardy).